**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **WAYNETTA PATTERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv- 00299** |
| | ) | **Judge Aleta A. Trauger** |
| **WAYNE HALFWAY HOUSE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is defendant Wayne Halfway House, Inc.'s Motion for Summary Judgment (Doc. No. 49), seeking judgment in its favor on plaintiff Waynetta Patterson's claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981, for discrimination and hostile work environment based on race and retaliation for engaging in protected activity. In her Response in Opposition to the Motion for Summary Judgment (Doc. No. 53), Patterson expressly abandons her hostile work environment claims but contends that material factual disputes preclude summary judgment on her discrimination and retaliation claims. For the reasons set forth herein, the motion will be granted.

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual

dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, inter alia, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). In other words, the material on which a party relies in support of a summary judgment motion does not need to be in a form admissible in evidence; rather, once an objection is "properly made" under Rule 56(c)(2), "the proponent must 'show that the material is admissible as presented or . . . explain the admissible form that is anticipated.'" *Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## II.    FACTS

The facts set forth herein are undisputed and viewed in the light most favorable to the plaintiff, as the non-moving party, unless otherwise indicated. Factual statements for which no citation is provided are drawn from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 54) or the defendant's Responses to Plaintiff's Statement of Additional Disputed Material Facts (Doc. No. 57) and are undisputed for purposes of the Motion for Summary Judgment.

### A.    WHH Begins Operating Standing Tall Music City

The defendant, Wayne Halfway House, Inc. ("WHH"), operates several juvenile justice, rehabilitation, and/or educational facilities within Middle Tennessee. (Doc. No. 34, Fourth Am. Compl. ¶ 3; Doc. No. 36, Answer ¶ 3.) Its corporate headquarters are located in Waynesboro, Tennessee. Jason Crews (White male) has been involved with the company as part owner and employee since 2003. (Doc. No. 55-4, Crews Rule 30(b)(6) Dep. ("Crews Dep.") 8, 10.)[1] Crews "basically run[s] the company," as CEO and chairman of the board, and is in charge of "run[ning] daily operations." (Crews Dep. 11.) He held the same position in November 2019. (*Id.*)

As of 2019, WHH operated one facility, Hollis Academy, in Waynesboro, Tennessee. (Crews Dep. 14.) In the fall of 2019, the State of Tennessee gave WHH the opportunity to take over operations of a juvenile facility in Nashville, Tennessee that became Standing Tall Music City ("STMC"). Accordingly, many of STMC's employees were hired in the October–November

---

[1] Because the plaintiff filed complete deposition transcripts for nearly all of the primary witnesses and labeled them appropriately, the court refers to these whenever possible. The defendant filed exhibits entitled only "Exhibit Depo Excerpt" and "Exhibit Declaration," without properly identifying them. Accordingly, the court has referred to these only when strictly necessary. (*See* Doc. No. 50 and attached exhibits.)

2019 time frame.[2] On November 4, 2019, WHH actually began operating STMC in Nashville. As of that date, STMC had 16 residents and a capacity for 50 residents. At some point in 2020, it reached maximum capacity, with 48–50 residents.

Plaintiff Waynetta Patterson (Black female), applied for a position as Youth Services Officer ("YSO") at STMC and was interviewed by Crews. She was hired as a YSO at $15 per hour and began working at the newly opened STMC on October 14, 2019. As YSO, she was responsible for providing direct care and the first line of supervision for the youth residents of the facility. She was at all times an at-will employee. At the time Patterson was hired, a majority of the staff at STMC was Black.

From October 14 to 18, 2019 Patterson completed a minimum of 30 hours of Pre-Service Training, which covered a number of topics including Incident Reporting, Cultural Awareness and Competency, Policy and Procedures Manual, Code of Ethics/Conduct, Personnel Manual, and other topics. The training was conducted by WHH's Staff Development Instructor ("SDI"), Liz McCown (White female), who was based at WHH's headquarters in Waynesboro. McCown travelled to Nashville to conduct the training at STMC.

During her training with McCown, Patterson expressed interest in the SDI position at STMC. The SDI would be responsible for training all new hires at STMC. McCown explained the SDI job duties to Patterson and told her she would speak to Crews about transferring the plaintiff to that position. Patterson provided her resume to McCown and McCown passed it along to Crews. (Doc. No. 55-1, Patterson Dep. 79.) Crews approved Patterson's promotion to the SDI position, so, within three weeks of going to work at STMC, the plaintiff was promoted from a YSO position

---

[2] Since the fall of 2019, WHH has expanded and now owns and/or operates a total of eight or nine facilities, including facilities in Dandridge, Columbia, and Jackson, Tennessee, as well as several in Florida. (Crews Dep. 15–16.)

to the SDI position. (Patterson Dep. 62–63, 80.) Although she agreed with the characterization of the job change as a "promotion" during her deposition, the plaintiff now contends that it was not actually a promotion, because it was not accompanied by a salary increase. (*See* Crews Dep. 31–32 ("I'm sure that quick, it was probably a lateral transfer. She probably transferred over at the same rate of pay, just because I would assume it was before the end of the year.").)

As the SDI at STMC, Patterson was considered part of WHH's Human Resources ("HR") Department. She reported directly to WHH's corporate HR Director in Waynesboro, Allen White (White male). She also reported indirectly to STMC's Facility Administrator ("FA"). (Crews Dep. 33, 35.) Each of WHH's FAs, including at STMC, has responsibility and control over their assigned facility, which includes oversight of the daily functions of the facility and the authority to address and rectify any employment issues.

Allen White reported to Crews. During the plaintiff's employment, Ericka Kemble (White female) was employed by WHH as Assistant Human Resources Director and was the HR employee onsite at STMC. (Doc. No. 50-8, Kemble Decl. ¶ 3.)[3] Kemble's job responsibilities at STMC included scheduling and conducting new hire interviews, hiring staff, and getting new hires on the schedule to work after in-service training. She reported directly to HR Director Allen White and indirectly to the FA at STMC. (Doc. No. 55-3, Kemble Dep. 18, 19; Crews Dep. 75–77). Phlonda Davis (Black female) was employed as STMC's HR Administrative Assistant. Davis was responsible for conducting new hire background checks but had no hiring or firing authority. During all relevant times, Doris Crenshaw (Black female) was STMC's Director of Security; she reported to the STMC FA. In November 2019, Mark Johnson (Black male), who was originally

---

[3] Kemble's name changed in the interim, and her last name is apparently Hawkins. (*See* Kemble Decl. ¶ 1.) To avoid confusion, the court will refer to her herein as Kemble.

hired as Director of Security, was promoted to fill the FA position at STMC. He remained the STMC FA until the end of February 2020. Alberto Mendoza (Hispanic male) began working as FA at STMC, replacing Johnson, in March 2020. FAs report to WHH's State Director. Tom Irwin (Black male) was WHH's State Director in 2019 and 2020. (White Dep. 48.)[4] In January 2020, WHH hired Larry Morrissett (White male) as its Chief Operating Officer.

From October 1, 2019 through April 17, 2020, during Patterson's employment at STMC, STMC hired 112 individuals, of whom 76.8% were Black and 18.7% were White, with the ethnicity of the remainder being Hispanic, Native American, or unknown. (Kemble Decl. ¶ 4(b).) During the same time period, 60 employees were separated from STMC, of whom 85% were Black and 15% were White. (*Id.*) From the date Mendoza was hired in March 2020 through the date that Patterson was fired on April 17, 2020, STMC hired 21 individuals, of whom 80.1% were Black and 9.5% were White. During the same timeframe, 28 employees were separated from STMC, of whom 85.7% were Black and 7.1% were White. (*Id.* ¶ 4(c).) On March 1, 2020, Black employees made up 80% of STMC's workforce. That percentage remained fairly constant (at 79.71%) as of May 1, 2020 and July 1, 2020. (*Id.* ¶ 4(d).)[5]

---

[4] Irwin claims that the did not become State Director until after the plaintiff's employment was terminated. (Doc. No. 50-6, Irwin Dep. 12.)

[5] The plaintiff purports to dispute these facts, pointing to Crews' testimony, in his capacity as WHH's corporate representative, that, although he did not know the precise racial composition of the workforce at STMC, he believed it was "right now and even most of the time . . . about 80 to 90 percent African American" and could not "imagine" it had ever been below 80 percent. (Crews Dep. 56.) He made it clear, however, that he did not have exact numbers in front of him and only knew for sure that the employees at STMC were "predominantly" African American. (*Id.* at 56–57.) Kemble's Declaration clarifies rather than contradicts Crews' testimony, and the plaintiff has not offered any countervailing evidence or any reason to call into question the accuracy of the statistics offered by Kemble.

### B.     The Plaintiff's Employment Experience

According to Patterson, during her initial onboarding training, Liz McCown complained to her about traveling from Waynesboro and "complained about us as [B]lack employees," referring to the predominantly Black training class as "monkeys and animals." (Patterson Dep. 60, 63.) More specifically, McCown seemed to Patterson to be ill at ease, so Patterson asked if she was okay. McCown told her "I just can't deal with a whole bunch of monkeys and animals in the same place." (*Id.* at 66.) Patterson was very offended by this comment and asked McCown what she meant by that, to which McCown responded, "It's just too much in here. It's loud." (*Id.* at 66, 67.) Patterson understood McCown to be referring to the Black employees as "monkeys." (*Id.* at 67–68, 78.) McCown also purportedly told Patterson that "[t]hey did not hire [B]lack employees" at Hollis Academy, in Waynesboro, and that she had never trained Black employees, because "it was a redneck town," meaning, apparently, that there were "not many African Americans living in that area." (*Id.* at 65.) Patterson did not report or complain about McCown's comments to Crews or any other management employees at WHH. (*Id.* at 73–75.)[6]

As the only SDI at STMC, Patterson trained all new employees across three shifts. It is undisputed that she was qualified for the position and that she worked long hours. Patterson was scheduled to work from 8:00 a.m. to 5:00 p.m. However, she frequently arrived at 5:00 a.m. and worked a significant amount of overtime. According to STMC's overtime policy, she was required to obtain authorization to work overtime. (*Id.* at 157.) Patterson testified that Allen White told her she was "supposed to come in any time that . . . the training needs to be done," and she interpreted

---

[6] In fact, the evidence indicates that McCown and Patterson enjoyed a collegial working relationship for the duration of the plaintiff's tenure with STMC. (*See* Patterson Dep. 216 (agreeing that she liked and got along with McCown and that they had "mutual respect"); *id.* at 216, 224 (referring to emails in which McCown and Patterson addressed each other as "sweet lady" and "love").)

this to mean she had to come in early to train employees who were working third shift. (*Id.* at 163.) When the plaintiff worked overtime, she completed Overtime Justification Forms and was approved for overtime. (Kemble Dep. 66.) FA Johnson occasionally talked to her about her large amounts of overtime. (Patterson Dep. 157.) At some point around December 2020, Allen White directed Patterson and others that they were to reduce or eliminate overtime. (*Id.* at 92, 314.)[7]

In late 2019, FA Johnson and Director of Security Crenshaw met with plaintiff to discuss two rumors associated with Patterson—the first having to do with the plaintiff's purportedly telling a YSO that he might move into Crenshaw's position, and the second being that Johnson was in a relationship with STMC Clinical Director Leah Sorenson-Morrissett (White female). (Patterson Dep. 139, 141.)

Regarding the first rumor, the plaintiff explained that the YSO had taken what she had said to him completely out of context. He had asked her about what he needed to do to advance within the company, and she had told him that he needed to apply for any open positions that were posted. (*Id.* at 139–40.) She told him he was doing well and had the potential to become a supervisor and continue to move up. She told him, hypothetically, that he might move into Crenshaw's position, who could take over Johnson's, who might "move to corporate." (*Id.* at 140.) The employee apparently took this comment to Crenshaw, who understood it to mean that Patterson was spreading a rumor that she was leaving the company and the YSO would take her job.

_____

[7] The defendant purports to dispute the plaintiff's statement that she was not permitted to work overtime, but its citations to the record do not actually establish whether the plaintiff was permitted to work overtime. The plaintiff later softened her stance, indicating that STMC was trying to reduce overtime. (Patterson Dep. 314.) In addition, the plaintiff testified, based on the Overtime Justification Forms that she completed and was shown during her deposition, that she worked 293.25 overtime hours and 1,077 regular hours from October 2019 through her termination on April 17, 2020. (Patterson Dep. 311, 312.)

Once this issue was dispelled by Patterson's explanation, Johnson told her he wanted to discuss the second rumor. Patterson confirmed that she had heard the rumor that he and Sorenson-Morrissett were in a relationship but denied spreading it. Rather, her concern was that "every time [she] c[a]me to [Johnson's] office, Ms. Leah [was] in there." (Patterson Dep. 143.) And apparently she had repeated that comment to others. (*See id.* at 145–46 ("[T]he reason why everybody attached my name [to the rumor], [was] because I kept saying, 'Well, you can't go in his office because Leah is always in there.' That was my comment.").) Johnson told her that Sorenson-Morrissett's department had a "lot of issues" that were "none of [Patterson's] business" and that she should "stay in [her] lane." (*Id.* at 148.) He also emphasized to Patterson that he had an open-door policy and she could come to him anytime.

In any event, Patterson apologized to both Crenshaw and Johnson and followed up with an email again apologizing for her conduct and thanking Johnson for not firing her for her "unprofessional and messy behavior." (*Id.* at 152; *see also* Doc. No. 50-1, at 101.) Patterson was not issued any written discipline related to this incident.

In January 2020, McCown and Patterson exchanged emails in which Patterson advised McCown that STMC employees were asking her about radios and equipment. McCown told Patterson that another STMC employee, Mr. Leach, was responsible for getting such equipment to staff—not Patterson. McCown added, "Not my monkeys not my circus. Just tell them to go talk to the appropriate person. You do not have to be the go-between." (Patterson Dep. 208.) Patterson responded, "LMBO," meaning "laughing my butt off." (*Id.* at 209.) She continued, "I will have [to] say that, too. I don't provide the radio and keys. Master control does. I give out shirts, lockers, keys." (*Id.* at 210.) During her deposition, Patterson stated that McCown's comment "not my monkeys not my circus" did not simply mean "that's not my problem." (*Id.* at 209.) Instead, she

considered McCown's comment to be racist, again characterizing staff members as monkeys and "refer[ring] back" to their first conversation. (*Id.* at 208–09.) She did not report or complain about this comment to anyone.

On January 20, 2020, WHH hired Brandy Gaskins (White female), who had previously been employed at a different juvenile facility not operated by WHH, as a shift supervisor at STMC. Just before Gaskins was to start, on Friday, January 17, 2020 and on January 18 and 20, 2020, Kemble and Patterson exchanged STMC business-related emails with the subject line "B. Gaskins-new hire," regarding the need to schedule Gaskin's onboarding training. (*See* Doc. No. 50-1, at 102–05.) Patterson's January 20, 2020 message was copied to FA Johnson, HR Assistant Administrator Phlonda Davis, and Clinical Director Sorenson-Morrissett. (*Id.* at 102–03.) Patterson emphasized the chain of communications that should have occurred relating to new hires who need training, requested that she not be contacted on weekends except in case of an emergency, and noted that she "would really appreciate it, if everyone would stay in their own lane as I was told to do as well. Now that I am in my own lane, everybody is [in] my lane with me. lol." (*Id.* at 103.)

Johnson responded to Patterson's email, stating he was "not in the business of pointing fingers or who did what" but that he had "positions that needed filled in the most efficient way possible," that "there was a breakdown with bringing in this employee," referring to Brandy Gaskins, and that they needed to identify the breakdown and "make sure it does not happen that way again." (*Id.* at 102.)

The plaintiff explained that, although the emails do not make this clear, she had been told by Allen White by this time to reduce overtime, and Kemble knew that Patterson was not supposed to work overtime. However, Kemble's initial email to her was sent after 5:00 p.m. on Friday

afternoon. (Patterson Dep. 314, 166.) Patterson acknowledged during her deposition that she was under no obligation to respond to after-hours emails, but she responded anyway. (*Id.* at 167.) However, she claimed that Kemble and Sorenson-Morrissett also called her repeatedly over the weekend. She did not answer her phone, and they told her on Monday that they had wanted to get Gaskins trained on Saturday so she could start work on Monday. (*Id.* at 169, 173–74.) Patterson copied Johnson and the others on her response on Monday because she was upset; according to Patterson, Kemble and Sorenson-Morrissett knew that she was not supposed to work overtime and kept calling and trying to get her to work over the weekend anyway. The plaintiff considered this to be harassing conduct. (*Id.* at 171–72.)[8] At some point, she called Allen White and Liz McCown in Waynesboro about the issue. (*Id.* at 176.) Patterson was not issued any discipline for not responding to emails over the weekend, for not responding to the Saturday emails, or for not working over the weekend. (*Id.* at 174.)

In any event, once Gaskins was hired, according to Patterson, she refused to accept pre-service CPR training from Patterson, stating that she would get it from her "boyfriend," Alberto Mendoza. (*Id.* at 178.) Crews, however, instructed Gaskins to go back to Patterson's training class, so she did. (*Id.* at 179.) Gaskins completed training with Patterson, though she exhibited "aggressive behavior" that disrupted the class. (*Id.*) The plaintiff testified that she did not recall whether she submitted a written report of discrimination or harassment about Gaskins. (*Id.* at 179–80.) No such report has been produced in discovery.

Alberto Mendoza was hired to be the FA at STMC, replacing Johnson, on March 1, 2020. As FA at STMC, Mendoza had authority to hire frontline staff and also to discipline all employees

---

[8] The plaintiff appears to use the term "harassment" as short-hand for race-based harassment or discrimination. (*See* Patterson Dep. 213.)

of STMC, including Patterson as SDI. When Mendoza was hired to be the FA, upper management of WHH determined that he should complete the ordinary training process before being introduced as the new FA. He completed his training with Patterson on March 24, 2020. Mendoza claims in a Declaration that, during his training, "Patterson was very upset that she was not being informed what position [Mendoza] would be taking. (Doc. No. 50-7, Mendoza Decl. ¶ 8.) In addition, although there is no evidence that he reported problems with the training to anyone contemporaneously, he now claims that Patterson was "quite negative and unprofessional" during his training. (*Id.* ¶ 9.)

The plaintiff attended a "corporate meeting and department head meeting" on March 18, 2020, conducted by Mendoza (whose position as the new FA had not yet been announced) and Larry Morrissett, at which Morrissett stated that "they wanted to change the culture." (Patterson Dep. 118.) Crews also attended this meeting. (*Id.* at 125.) Although there was no discussion about firing anyone during this meeting, the plaintiff interpreted "change the culture" to mean that the company intended to fire Black people and hire more White people. (*Id.* at 119–20, 124.)

The statement "bothered" Patterson and Phlonda Davis, so they went to State Director Tom Irwin immediately after the meeting, told him the statement "didn't sound right," and asked if it meant that that Morrissett was "trying to get rid of all the [B]lack employees." (*Id.* at 127.)[9] According to Patterson, Irwin responded, "Well, . . . if there's nothing but black employees here, . . . what does that mean?" (*Id.*) Patterson told him, "Well, I'm fixin' to go ask him." (*Id.*) She then walked down the hall and asked Morrissett directly what he meant. Morrissett responded, "Well . . . , you know, Standing Tall, they don't know what they are doing here, so we need to take on

---

[9] Davis testified that she was not at the meeting and did not hear the comment, but she recalled that the plaintiff told her about it. (Doc. No. 55-6, Davis Dep. 117.) Irwin denies that the plaintiff discussed anything of this nature with him. (Doc. No. 50-6, Irwin Dep. 14.)

the Natchez Trace facility, you know, their policies and things like that. . . the regulations, or how it's supposed to be done here. Crews don't know what he's talking about." (*Id.* at 127–28.) But the plaintiff "knew" what "culture" meant—implying that she knew it really meant "race." (*See id.* at 128.)

According to Kemble, around the time of this meeting, the morale at STMC was "low" and "very negative," with staff frequently arriving late to work. (Kemble Dep. 73.) Mendoza used nearly identical wording in his Declaration, stating that, as of mid-March 2020, he and "other management members recognized and acknowledged that the [STMC] workplace morale was low, there were negative attitudes among staff, employees were coming in late to work, and all these issues needed addressing and correcting." (Mendoza Decl. ¶ 15.) According to Mendoza, Morrissett's statement about needing to change the culture at STMC meant they needed "enforcement of policies and procedures, and to improve and create positive attitudes and workplace along with increased morale." (*Id.* ¶ 16.)[10]

According to Patterson, while Mendoza was FA at STMC, Mendoza and Gaskins were in a dating relationship, and Mendoza treated Gaskins markedly better than all the other STMC employees. Patterson believed Mendoza treated Gaskins preferentially because she was his "significant other" and because she was White. (Patterson Dep. 114–15.) At some point, STMC employees were so "upset" about Mendoza's and WHH's "discrimination," manifested by the preferential treatment of Gaskins, that the second shift went on "strike" by not reporting to work for two days. (*Id.* at 115, 117.) Gaskins was so angry that everyone on second shift had called out

_____

[10] According to the plaintiff, after the March 18, 2020 meeting, White employees began "pouring in" at STMC, because Mendoza began firing Black employees and replacing them with White employees. (Patterson Dep. 120, 121, 124–25.) The plaintiff's subjective belief in that regard is not sufficient to refute the defendant's statistical evidence, introduced by Kemble.

that she yelled at Mendoza, "I'm going to fire all of these mother fuckers." (*Id.* at 116.) Patterson insisted that this was a racist comment, because the employees who were not coming to work were all Black, but she acknowledged that Gaskins had no authority to fire anyone. (*Id.* at 117–18.)

### C. The Plaintiff's Complaints About Mistreatment

On March 16, 2020, the plaintiff sent Kemble an email that the plaintiff characterizes as complaining to Kemble that Kemble was treating her differently because of her race. That lengthy email (in the record at Doc. No. 50-1, at 110–14) complains about a lot of things, including the plaintiff's perception that Kemble was trying to shortcut the training procedure (thus undermining the company's integrity and giving rise to potential liability), ignoring the established procedure for scheduling newly hired employees after they completed training, overstepping her bounds and interfering with the plaintiff's ability to do her job, and improperly emailing Patterson after hours. It does not, however, mention race either implicitly or explicitly; nor does it suggest disparate treatment based on race. (*See generally id.*)

The plaintiff also testified that she complained to White about Kemble some time in April 2020, when she called him to discuss the same email. According to Patterson, she reported to White that Kemble was "ignoring [her] and keeping her door shut." (Patterson Dep. 87.) She began crying during the conversation, and White began laughing, and "that was it." (*Id.*) She hung up, still crying, and did not report to White again. She does not indicate that she mentioned race to White as the reason for Kemble's behavior toward her.

Patterson allegedly complained about her mistreatment by Kemble to numerous other people, including Tom Irwin, Caine Beckham,[11] Liz McCown, and Phlonda Davis, among others,

---

[11] According to Crews, Beckham was "basically" his chief of staff in 2019–2020. (Crews Dep. 90.)

but the plaintiff does not make it clear that any of these complaints were actually about being treated differently because of race, as opposed to simply being mistreated. For instance, she told Caine Beckham, who was setting up cameras and helping Morrissett with his computer before a meeting, that Kemble "thinks just because she's Mr. Crews's niece she can treat us any way she wants to." (Patterson Dep. 96–97.) Regarding a text exchange with McCown in which Patterson stated that Kemble was "harassing Ms. Davis about the process to do the background checks," the plaintiff clarified that by "harassment" she meant racial harassment, "because Ms. Phlonda [Davis] is [B]lack and Ms. Erika [Kemble] is [W]hite." (*Id.* at 213.) She also claims that she told McCown about being "mistreated" by numerous individuals, including FA Mark Johnson and Director of Security Mimi Crenshaw (both of whom are Black), as well as Leah Sorenson-Morrissett, "for the same reasons"—that is, "[d]iscrimination, harassment, and retaliation." (*Id.* at 100.) Even though it seems clear that Patterson believed that these were the reasons for the mistreatment, she offers no evidence that she shared those reasons with McCown (or anyone else).

The plaintiff claims that, during the week of April 13, 2020, she reported Mendoza's "discriminatory conduct" to HR Director White and State Director Irwin, citing her own deposition testimony in support of that statement. Her testimony, however, reflects that she complained to White about *Kemble*, not Mendoza, and she complained that Kemble was ignoring her and keeping her office door shut but did not attribute that behavior to race. (*See id.* at 83–87, 270.) She stated that she complained to McCown about Mendoza, among many others, but she does not indicate what she actually said to McCown about Mendoza. (*Id.* at 100.) On the other hand, both White and Irwin testified that Patterson never complained to them about race discrimination by anyone. (White Dep. 77, 134–35; Doc. No. 50-6, Irwin Dep. 14, 16, 28.)

### D.	The Plaintiff's Termination

According to Allen White, he thought that Patterson was doing a good job in her position as SDI, but, in late 2019 or early 2020, he began to receive complaints from Kemble and either Johnson or Mendoza, or both, that she was creating a "hostile or toxic work environment." (White Dep. 60–65.) White did not recall the complaints clearly and he was somewhat vague about who complained. (*See id.*) White stated that he probably would have told the FA (whether Johnson or Mendoza) to document his complaints in writing, but he did not believe that ever occurred, and White himself never documented any complaints he received about Patterson. (*Id.* at 62, 65.) Specifically, the complaints appeared to be that Patterson was "undermining the FA and some of the . . . supervisors." (*Id.* at 66.) White confirmed that he did not receive complaints about Patterson based on any other issues.

Mendoza, who is no longer employed by WHH, states in a Declaration that, as FA at STMC, he had the authority to hire "frontline" employees at the facility, as well as the authority to discipline all STMC employees, including Patterson. (Mendoza Decl. ¶ 10.) In his role as FA, Mendoza purportedly received reports from, among others, Erika Kemble, concerning Patterson's "attitude and uncooperative behavior" toward Kemble and other staff. (*Id.* ¶ 12.) He spoke with HR Director White "several times" about Patterson's behavior, "advising him that she was creating a hostile and toxic workplace" and "engaging in conduct that undermined [Mendoza's] position." (*Id.* ¶ 13.) Mendoza states that Patterson's office was across from his, and he noticed that "she regularly talked negatively with new hires and was creating a somewhat negative environment from the start." (*Id.*)

The actual incident leading to the plaintiff's termination took place on or around April 16, 2020. Regarding that event, Mendoza testified as follows:

In mid-April 2020, I became aware of a new hire employee becoming upset over his assigned work schedule. I found the new hire standing in Waynetta Patterson's new hire training class fussing about his work schedule in front of other new hires in the classroom. I walked into the training room and advised the new hire that his assigned schedule was the schedule he would be working and if he did not want to work the schedule he could leave. The new hire's scheduling issues did not require Waynetta Patterson's involvement. Nonetheless, Waynetta Patterson interjected herself in the conversation asking questions and telling me how I should go about handling the new hire's issue. I instructed Waynetta Patterson to stay out of it and reminded her that the issue did not concern her. Waynetta Patterson kept talking and even stated that . . . Brandy Gaskins was lying to the new hire about the scheduling issue.

(*Id.* ¶ 17.)

Mendoza further states that he "found Waynetta Patterson's conduct" to be "consistent" with his own experience with Patterson and with reports and concerns he had already received about her, and he considered her "behavior and attitude toward [him] in front of the new hire class to be disrespectful, insubordinate, and hostile." (*Id.* ¶ 18.) He also believed it was not a "good first impression for the new hires present." (*Id.*)

Patterson's account of this incident differs from Mendoza's. According to Patterson's version, most of which the defendant does not dispute for purposes of its summary judgment motion, a new hire approached Patterson during a training class she was conducting on April 16, 2020, to discuss a scheduling conflict he was experiencing as a result of a schedule that Gaskins had given him. However, Kemble, not Gaskins, was supposed to be in charge of scheduling the new hires. When Mendoza overheard the employee complaining to Patterson, he came into Patterson's classroom and intervened in the conversation. (Patterson Dep. 254.) Mendoza told the employee that he would work the schedule Gaskins gave him or he could leave. (*Id.*) When Patterson "respectfully asked him what happened," Mendoza told her to "stay out of it." (*Id.* at 255.) Patterson responded that he needed to speak to the new hire about what had actually happened and that the new hire had told Patterson that "Ms. Gaskins is lying." (*Id.*) Mendoza

yelled at Patterson to "shut up." (*Id.* at 256.) According to Patterson, the scheduling of trainees is part of her job, because she remains the trainees' supervisor until they complete training. (*Id.* at 256–58.)

On the same day, Patterson sent Irwin an email with the subject line, "I NEED TO TALK TO YOU ASAP!!!" (Doc. No. 55-26.) The body of the email did not contain a message. Irwin did not respond to the email or call Patterson, because "[t]here was no need for [him] to talk to her." (Doc. No. 55-5, Irwin Dep. 24.)

Mendoza states that, after the incident on April 16, 2020, he decided to terminate Patterson "because of her pattern of conduct and behavior that [he] considered unacceptable in her job performance, her conduct to co-workers, and contributing to a negative workplace culture." (Mendoza Decl. ¶ 21.) He also states that he was "aware that the many hours [she] was working compared to the work that was completed did not add up" (*id.* ¶ 19), even though there is no dispute that the Overtime Justification Forms Patterson completed were approved (Kemble Dep. 66). Mendoza affirmatively avers that Patterson's race did not play any part in his decision to terminate her. (Mendoza Decl. ¶ 22.) In addition, Patterson had never reported or complained to him about discrimination, harassment, or retaliation based on race or any other reason, and he was unaware of her ever reporting to anyone at WHH or STMC complaints or concerns about discrimination, harassment, or retaliation based on race. (*Id.* at ¶ 20.) This statement is undisputed for purposes of the Motion for Summary Judgment. (Doc. No. 54, Pl.'s Resp. to Def.'s SUF ¶ 78.)

On the evening of April 16, 2020, Mendoza called Kemble to notify her that he intended to discharge Patterson the following day. (Kemble Dep. 46–47.) According to Kemble, Mendoza told her that Patterson had "disrespected him in front of a training class." (*Id.* at 48.) Kemble did not remember the details of the incident; she recalled only that the encounter had something to do

with an employee's schedule. (*Id.* at 49.) Mendoza requested Kemble's presence as the HR assistant to witness and document the termination. (*Id.* at 53–54.)

On April 17, 2020, Mendoza directed Kemble to bring Patterson to his office. Mimi Crenshaw was also present when they arrived. (Patterson Dep. 261.) According to Patterson, when she arrived in Mendoza's office, he "started on talking about changing the culture." (*Id.* at 263.) She interrupted him to ask, "Are you terminating me?" (*Id.*) He said, "Yes," and she said, "Thank you," and walked out to get her things. (*Id.*) Patterson stated that, as soon as he said "changing the culture," "that was it for [her]," and she had no need to stay and hear anything else he might have to say. (*Id.* at 263–64.) She "knew what [that phrase] meant." (*Id.* at 264.)

The plaintiff testified that she called Tom Irwin immediately after her termination, and he told her that her termination was "discrimination" and he would "check into it."[12] (*Id.* at 266, 267, 269.) She claims she told Irwin that Mendoza was firing Black employees and replacing them with White employees, and Irwin allegedly told her that they had received "at least four complaints about racial discrimination and harassment" about Mendoza and that "students were complaining." (*Id.* at 268–69.) However, Irwin never called her back after that conversation. (*Id.* at 267.) Patterson called Caine Beckham right after that, who also said he would "investigate," but he never got back to her either. (*Id.* at 269.) She tried to call Allen White, but he did not respond. (*Id.* at 270.)

Prior to the termination, Mendoza did not consult with White or Crews or "any other management members." (Mendoza Decl. ¶ 22.) McCown, Kemble, and Crenshaw were not involved in the decision to terminated Patterson.

---

[12] Irwin, again, does not recall ever having a telephone call with Patterson and denies that she ever reported concerns about Mendoza to him. (Doc. No. 50-6, Irwin Dep. 16, 26.)

Prior to the termination, the plaintiff had never received a performance evaluation or a disciplinary write up, had never been placed on a performance improvement plan, and had never received any notice or documentation of complaints against her for contributing to a negative workplace culture or unsatisfactory work. It is undisputed that Crews, as CEO, was unaware of any problems with Patterson's day-to-day work, aside from receiving one email from Mark Johnson at some point about her taking too much overtime. (Crews Dep. 45–46.) Irwin had no issues with Patterson's performance, attitude, or anything else, and no one reported any problems to him. The YSOs at STMC, too, had not expressed complaints about Patterson to Kemble, the HR employee at STMC. Although White vaguely recalled that Kemble, Mendoza, and Johnson had called him with complaints about Patterson's attitude, he did not recall any complaints about her job performance *per se*, and he did not document any of the verbal complaints he received. (White Dep. 61–66; 101–02.)

After the termination, Mendoza and Kemble discussed the reasons for it to include in the Separation Notice. Kemble drafted the notice three days later and mailed it to the plaintiff. The Separation Notice that Patterson received in the mail stated that she was "discharged/fired" due to "Unsatisfactory work. Conduct to employees. Contributing to negative workplace culture." (Patterson Dep. 266; Doc. No. 55-18.)

On April 26, 2020, Mendoza promoted Gaskins to replace Patterson. While Patterson had been paid $15 per hour in the position, Gaskins received $20 per hour.

### E.    WHH's Treatment of Other Employees

The plaintiff claims that WHH treated White employees and employees who did not report discrimination differently from her, insofar as those employees received performance improvement plans, performance evaluations, and disciplinary write-ups, while she was fired without warning and never received a performance evaluation. In support of this statement, she

cites Allen White's deposition testimony at page 44. As reflected there, White testified that, in 2019 and 2020, the company's practice, and his practice, was to provide performance evaluations for the HR employees under his supervision at 90 days, 6 months, and one year. (White Dep. 44.) It is undisputed, however, that he did not conduct any performance evaluations for Patterson. He stated that it would have been either his responsibility or Kemble's to perform evaluations for Patterson, as Kemble was the HR Assistant Director on-site at STMC. (*Id.* at 45.)

Kemble testified that she assumed it would either have been White's or the FA's responsibility to conduct performance evaluations for Patterson, but she did not think anyone ever did one for her. (Kemble Dep. 43.) Kemble's impression was that, because STMC was "so new that at the time [Patterson] was employed" and the "organizational chart" kept changing, it was not clear who was supposed to have evaluated Patterson. (*Id.* at 43–44.) In her Declaration, Kemble stated that, during Patterson's employment with STMC, nine White employees would have been eligible to receive 90-day or 180-day evaluations, but none of the nine employees received their evaluations. (Kemble Decl. ¶ 4(a).)[13]

While Kemble was at STMC, she had occasion to write up other employees, primarily YSOs, for such matters as time and attendance. This practice became more frequent during the second half of 2020, when STMC acquired a new FA, Stacy Williams (Black female), who was stricter about documentation than Mendoza. (Kemble Dep. 25–29.)

In March 2020, shortly after Mendoza started as FA at STMC, Gaskins received a written Employee Warning Disciplinary Notice from Mimi Crenshaw for unsatisfactory work

---

[13] The plaintiff purports to dispute this, pointing out that Kemble testified she did performance evaluations for Gaskins and Phlonda Davis, but there is no evidence when these evaluations occurred or that they took place while the plaintiff was still employed. Moreover, Patterson was terminated before Gaskins had been employed at WHH for 90 days.

performance, but she was nonetheless promoted to the SDI position approximately six weeks later. (White Dep. 89–90; Kemble Dep. 23–24.) In June 2021, Gaskins was demoted to a YSO position by the FA at the time, apparently Stacy Williams, but she resigned instead of accepting the demotion. (White Dep. 91–98; *see also* Doc. No. 55-13.) A typed letter in her personnel file explained, at Gaskins' request, that Gaskins was demoted for failing to communicate with her immediate supervisor, after having received write-ups for the same issue, and for making false accusations against staff, residents, and the company. (Doc. No. 44-13, at 5.)

## III. ANALYSIS

The plaintiff has abandoned her hostile work environment claims but opposes summary judgment on her discrimination and retaliation claims under Title VII and 42 U.S.C. § 1981. The parties make no distinctions between the standards applicable under the two statutory schemes, so the court presumes without analysis that they are the same.

### A. Retaliation Claims

Patterson alleges that WHH unlawfully retaliated against her for her complaints about allegedly racist conduct by Kemble, the allegedly racist "change the culture" comment by Morrissett, and Mendoza's allegedly discriminatory conduct both before and after he terminated her. (*See* Doc. No. 53, at 13–14.) Because Patterson offers no direct evidence of retaliation, the court considers this claim under the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020).

Under this framework, Patterson has the initial burden of establishing a *prima facie* case of retaliation. To do so, she must point to evidence sufficient to convince a jury that: (1) she engaged in activity protected under Title VII; (2) the employer knew she engaged in protected activity; (3) an adverse employment action was subsequently taken against her; and (4) Patterson's

protected activity was the but-for cause of the adverse employment action. *Kenney*, 965 F.3d at 448; *Laster v. City of Kalamazoo*, 746 F.3d 714, 730–31 (6th Cir. 2014). If the plaintiff can establish her *prima facie* case, the burden shifts to WHH to provide a "legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. And if WHH does so, the burden of production shifts back to Patterson to demonstrate that WHH's proffered reason was a mere pretext for discrimination. *Kenney*, 965 F.3d at 448; *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003).

WHH argues that it is entitled to summary judgment on the plaintiff's retaliation claims, because she cannot establish three of the four elements of her *prima facie* case—that she actually engaged in protected activity, that the defendant knew she engaged in protected activity, or that there was a causal connection between her engaging in protected activity and the termination decision. In response, the plaintiff argues that she has created at least a material factual dispute as to each of these elements. Regarding causation, she asserts that the very close temporal proximity between her protected activity and her termination is sufficient to give rise to an inference of causation, particularly because it is coupled with other indicia of causation, including the "disparate treatment and supervisory hostility and abuse that continued even after she reported discrimination." (Doc. No. 53, at 14.)

The court, having scrutinized the record, finds no evidence that the plaintiff actually engaged in protected activity. While the record establishes that the plaintiff complained about Kemble's treatment of her to Kemble and to numerous others, it does not show that her complaints were in any way related to race. In addition, there is no evidence that she complained about Mendoza to anyone before she was fired. Rather, the evidence to which the plaintiff points in

support of her allegations that she complained about Mendoza instead shows only that she complained about Kemble.

By the plaintiff's own account, the only time she expressly raised the issue of race was when she asked Irwin, and then Morrissett himself, what Morrissett meant when he told the staff at STMC that they were going to "change the culture" at the facility. The plaintiff claims that Irwin implicitly agreed with her that the comment meant that the company was trying to "get rid of" Black employees. (Patterson Dep. 127.)

Even assuming this conversation occurred and that it constituted protected activity, the Sixth Circuit has made it clear that, to establish the second element of her *prima facie* case, the plaintiff must show that her protected activity was "known to those who made [the adverse employment] decision." *Cline v. BWXT Y-12, LLC*, 521 F.3d 507, 513 (6th Cir. 2008) (quoting *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999)). It is undisputed that Mendoza was not aware at the time he made the termination decision that Patterson had raised complaints or concerns about race discrimination, harassment, or retaliation to anyone. (Doc. No. 54, Pl.'s Resp. to Def.'s SUMF ¶ 78.) It is also undisputed that Mendoza alone made the termination decision. (*Id.* ¶¶ 82, 87.) As a result, the plaintiff cannot prove either the decisionmaker's knowledge of her protected activity or a causal connection between the protected activity and the adverse employment action.

WHH is entitled to summary judgment on the plaintiff's retaliation claims, under both Title VII and § 1981.

### B.     Discrimination Claims

Like her retaliation claims, the plaintiff's discrimination claims, in the absence of direct evidence of discrimination, are analyzed under the *McDonnell Douglas* burden-shifting framework. Under this framework, again, the plaintiff bears the initial burden of establishing a

*prima facie* case of discrimination. Once she does so, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. And if the defendant meets this burden, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016); *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391–92 (6th Cir. 2008).

To prove a *prima facie* case in the discrimination context, the plaintiff must show that: (1) she is a member of a protected class, (2) was qualified for her job, (3) suffered an adverse employment decision, and (4) "was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019); *White*, 533 F.3d at 391.

WHH concedes here that the plaintiff has satisfied all four elements of her *prima facie* case: (1) as a Black woman, she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action when her employment was terminated; and (4) she was replaced by Brandy Gaskins, who is White and therefore outside the protected class. The defendant argues that it is nonetheless entitled to summary judgment, because it has offered legitimate, non-discriminatory reasons for the employment decision, and the plaintiff cannot establish that the reasons are pretext for discrimination.

### 1. The Defendant's Proffered Reasons for the Termination

Mendoza alone made the decision to terminate Patterson. According to Mendoza, he personally experienced Patterson's "negative and unprofessional" attitude when he underwent training with her. (Mendoza Decl. ¶ 9.) In addition, he received reports from Kemble concerning Patterson's "attitude and uncooperative behavior toward her." (*Id.* ¶ 12.) He spoke with HR Director White "several times regarding Waynetta Patterson's conduct advising him that she was

creating a hostile and toxic workplace" and "undermin[ing] his position" and that of some other STMC staff by issuing "instructions that were contrary to what [he] and [other] supervisors had instructed staff." (*Id.* ¶ 13.) Mendoza claims that, because his office was across from hers, he overheard her regularly talking negatively to new hires. (*Id.* ¶ 14.) He also states that he was aware that her overtime hours did not correlate with the amount of work she completed. (*Id.* ¶ 19.) Finally, there is no dispute that the plaintiff and Mendoza were involved in a verbal confrontation regarding a new hire's scheduling issue the day before Mendoza terminated her and that the confrontation took place before a class of new hires. According to Mendoza, he found Patterson's conduct to be "disrespectful, insubordinate, and hostile." (*Id.* ¶ 18.) His ultimate decision to terminate her employment was based on his own observations and experience with Patterson, as well as the reports from "other management members regarding Waynetta Patterson's uncooperative and negative conduct." (*Id.* ¶ 22.)

### 2. *Whether the Plaintiff Can Establish Pretext*

A plaintiff typically endeavors to establish pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). But, as the Sixth Circuit has explained, "these are not the only ways that a plaintiff can establish pretext; these three categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.* (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012), and *Chen*, 580 F.3d at 400)). Thus, for example, a plaintiff may demonstrate pretext by "offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment

action was its actual motivation." *Roschival v. Hurley Med. Ctr.*, 695 F. App'x 923, 928–29 (6th Cir. 2017) (quoting *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009)). In addition, the Sixth Circuit has recognized that "deviating from policy may point to pretext, at least in light of other relevant facts." *Id.* (citing *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 422 (6th Cir. 1999)).

In this case, Patterson first argues that Mendoza's alleged reasons for terminating her shifted over time, which would permit a reasonable jury to conclude that the offered reasons are pretext for discrimination. More specifically, she claims that Mendoza originally told Kemble, when he called her the evening after the classroom incident on April 16, 2020, that Patterson had "disrespected him in front of the training class," but, when he met with Patterson the next day, he told her that they were "changing the culture" at STMC. (Doc. No. 53, at 16.) And then, in the Separation Notice drafted three days later, the reasons provided were "[u]nsatisfactory work," "[c]onduct to employees," and "[c]ontributing to a negative workplace culture." (Doc. No. 55-18.)

The Sixth Circuit, indeed, has recognized that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) (quoting *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996), *am. on other grounds*, 97 F.3d 833 (6th Cir. 1997)). This is because "[s]hifting justifications over time calls the credibility of those justifications into question." *Id.* In *Cicero*, however, the defendant gave one reason for the plaintiff's termination when it fired him, another when it answered interrogatories, yet another when company president was deposed, which changed again while the court was considering the defendant's summary judgment motion. *Id.* The court noted that, while it "does not question business decisions," "[w]hen the justification for an adverse employment action changes during litigation, that inconsistency raises an issue

whether the proffered reason truly motivated the defendant['s] decision." *Id.* at 592. Likewise, in *Thurman*, the defendant offered one reason at the time of the adverse employment action, another when answering interrogatories during the course of litigation, and another in the pretrial order. *Thurman*, 90 F.3d at 1167.

Here, conversely, the defendant's rationale has not shifted over time. Instead, the reasons set forth in the Separation Notice are the reasons that Mendoza and WHH continue to rely on. The fact that Mendoza did not relay every reason for terminating the plaintiff when he called Kemble to notify her that he needed her to witness and document the termination, telling her only that the plaintiff had disrespected him before a class of new hires, does not establish a shifting rationale, as Mendoza had no obligation to provide Kemble with every (or any) reason for his decision. Moreover, that statement was not inconsistent with the reasons set forth in the Separation Notice. The plaintiff's reliance on Mendoza's telling her only that they wanted to change the culture at STMC is also misplaced, because the plaintiff admits that she cut Mendoza off at that point to ask if she was being fired and never provided him an opportunity to elaborate on the reasons for his decision. Moreover, Mendoza's stated desire to "change the culture" is completely consistent with terminating the plaintiff for "[c]onduct to employees" and "[c]ontributing to a negative workplace culture," and it does not conflict with unsatisfactory job performance, the other reason stated on the Separation Notice. "[P]roviding additional, non-discriminatory reasons that do not conflict with the one stated at the time of discharge does not constitute shifting justifications." *Miles*, 946 F.3d at 891.[14]

---

[14] In *Miles*, the plaintiff was told at the time she was terminated "that she was being fired subject to an 'at will dismissal,' 'without notice and without reason.'" *Miles*, 946 F.3d at 890–91. Only after the plaintiff filed an EEOC complaint did the defendant provide a reason for her termination, from which it never subsequently deviated. *Id.* at 891. Under this circumstance, the court found no evidence of "shifting rationales." *Id.*

The plaintiff also contends that Mendoza's professed reliance on "[u]nsatisfactory work" as one of the reasons for firing her is demonstrably false or else did not actually motivate the decision, because Crews testified in his capacity as the company's Rule 30(b)(6) witness that he was not aware of any performance deficiencies; no YSOs expressed concerns about her conduct to White; neither Crenshaw nor Davis expressed concerns about her performance to anyone; Irwin had no problems with her attitude or performance and had not received complaints from any other employees about her attitude or performance; and Patterson never received any disciplinary write-ups or progressive discipline related to her performance or attitude at any time during her employment at STMC. (Doc. No. 53, at 16–17.)

The record is clear, however, that Crews, White, Crenshaw, and Davis had no input in the termination decision. It is also undisputed that the plaintiff had been directed as early as December 2019 to reduce overtime and that she had been talked to by both Johnson and White about reducing overtime. (*See* Patterson Dep. 92, 157, 314.) Despite being asked to reduce overtime, the plaintiff still worked 293.25 overtime hours (and 1,077 regular hours) during her sixth months of employment with WHH, and most of the Overtime Justification Forms were from 2020. (*Id.* at 309, 311, 312.) Thus, the plaintiff cannot dispute that she worked a substantial amount of overtime, and, even if she was not disciplined for it, her use of overtime provided an objective basis for dissatisfaction with her job performance.

The plaintiff also contends that the defendant's deviation from its own policies regarding progressive discipline constitutes sufficient evidence of pretext that a reasonable jury could conclude that the asserted reasons for discharge did not actually motivate the termination decision. As noted above, the Sixth Circuit has held that "deviating from policy may point to pretext, at least in light of other relevant facts." *Roschival*, 695 F. App'x at 629. The relevant facts here, however,

are that STMC had only been operating for approximately five months at the time of Patterson's termination and does not appear to have adopted consistent HR policies during that timeframe, as established by Kemble's testimony that none of the White employees eligible for 90-day or 180-day performance reviews during Patterson's tenure with the company actually received them. (Kemble Decl. ¶ 4(a).) And the plaintiff presents no evidence regarding Mendoza's disciplinary practices, either before or after her termination. Notably, when he fired her, Mendoza had only been FA at STMC for less than one month.

Finally, the plaintiff asserts that the defendant gave White employees performance improvement plans and disciplinary write-ups rather than firing them, but it fired her for comparable conduct. She seeks to compare herself, in particular, to Gaskins, pointing out that Gaskins was issued an "Employee Warning Discipline Notice" for "Unsatisfactory Work/Performance" on March 4, 2020, but, despite that write-up, she was promoted into the SDI position six weeks later, after Patterson was fired. Gaskins was then demoted, rather than fired, in June 2021 (more than a year later). The letter in her personnel file accompanying the demotion notes that she had "failed to communicate with her immediate supervisor" and had previously "been given a verbal warning as well as a written reminder on communication" and that she had made "false accusations" against "staff, residents, and company." (Doc. No. 55-13, at 5.) The plaintiff argues that a reasonable jury could find that Patterson and Gaskins were "similarly situated in 'the relevant respects' and 'engaged in acts of comparable seriousness'" and further, that the Sixth Circuit has "repeatedly cautioned against reading the 'similarly situated' standard narrowly." (Doc. No. 53, at 19 & n.4 (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012), and citing *Jackson v. FedEx Corp. Servs.*, 518 F.3d 388, 396–97 (6th Cir. 2008)).)

Evidence that employees outside the plaintiff's protected class were not disciplined (or received lesser punishment) for engaging in "substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff" implicates the "third category of pretext." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). This method of showing pretext is a "direct attack on the credibility of the employer's proffered motivation for disciplining the plaintiff and, if shown, 'permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's *prima facie* case.'" *Id.* (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)); *see also Moore v. City of Clarksville*, No. 3:10-0141, 2011 WL 2938459, at *7 (M.D. Tenn. July 19, 2011) (Sharp, J.) ("If a jury were to determine that the proposed comparators engaged in comparable wrongdoing, but received lesser sanctions, the jury could also decide that Plaintiff's action did not warrant termination, and that the real reason for h[er] termination was that Defendant [discriminated] against h[er]. . . .").

Regarding the plaintiff's standard of proof at the pretext stage, in comparison with the standard applied to the "disparate treatment" element of a *prima facie* case, the Sixth Circuit has explained:

> [A]t the *prima facie* stage, this court has held that "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." [*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)] (citation omitted). Failure to satisfy these requirements, however, does not automatically destroy comparator status and plaintiffs need not show an exact correlation between themselves and others similarly situated. *Bobo*[,665 F.3d at 751]. But still, the plaintiff must show that she is similar to her proposed comparator in "all relevant respects." *Id.* There is some tension between this liberalized standard at the *prima facie* stage, in which substantially *similar* conduct can suffice to establish comparator status, and the pretext stage, which requires "substantially *identical* conduct." *Compare Chattman*, 686 F.3d at 349, *with Bobo*, 665 F.3d at 751. So even though we note that *Bobo* cautions us not to apply *Mitchell*'s factors formulaically, we remain

aware of the closer correlation required for the comparators' conduct at the pretext stage.

*Miles*, 946 F.3d at 893–94 (emphasis added).

The plaintiff cannot show that she and Gaskins engaged in "substantially identical conduct," nor that they were similarly situated in all relevant respects. First, at the time that Gaskins received written discipline in March 2020, she was in a completely different position (that of shift supervisor) and her direct supervisor was Mimi Crenshaw, Director of Security. (*See* Kemble Dep. 23 (identifying the supervisor's signature on the form as Crenshaw's).) Moreover, Gaskins admitted to the oversight (being distracted and failing to notice a youth resident hiding in another resident's room) that led to the discipline. (Doc. No. 55-13, at 1.) The plaintiff was not similarly situated to Gaskins in any relevant respect when Gaskins was disciplined by Crenshaw.

The reasons given for Gaskins' demotion from the SDI position were repeated failures to communicate with her direct supervisor, following written discipline for the same issue, and making "false accusations" and "falsely reporting events." (*Id.* at 5.) The plaintiff, conversely, was perceived as having been disrespectful to her direct supervisor in front of a class of new hires, creating a generally toxic work environment, and not managing her time well. This is not substantially identical conduct. Moreover, even if the court were to presume that Gaskins' and Patterson's conduct was of comparable seriousness, at the time she was disciplined for failure to communicate and later demoted, Gaskins had been in her position for more than a year and was supervised by a different FA, Stacy Williams. According to Kemble, Stacy Williams was "stricter" about write-ups than Mendoza had been. (Kemble Dep. 28–29.) The fact that Gaskins and Patterson had been in their positions for different lengths of time, were supervised and disciplined

by different FAs, and were disciplined for entirely different reasons means that the plaintiff cannot establish that they were similarly situated in all relevant respects.[15]

The court finds, in sum, that the plaintiff has not pointed to sufficient evidence in the record from which a reasonable jury could conclude that the defendant's proffered reason for the termination decision was pretextual. The defendant is entitled to summary judgment on the plaintiff's discrimination claims as well.

## IV. CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment (Doc. No. 49) will be granted and this case dismissed.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

---

[15] As WHH points out, the fact that Gaskins had previously received written discipline while the plaintiff never received written discipline actually suggests that the plaintiff received more lenient treatment during her employment than Gaskins did.